United States District Court
Southern District of Texas
**ENTERED**
June 18, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| EAGLEBURGMANN INDUSTRIES LP, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL BERNSTEIN and PRECISION SERVICES INDUSTRIAL GROUP, LLC, <br><br> Defendants. | Civil Action No. 4:25-cv-04967 |

**AGREED INJUNCTION**

Presently before the Court is the Parties' Joint Motion for Entry of Agreed Injunction (the "Motion").

After reviewing the Motion, the Court finds the proposed Agreed Injunction arises from the pleaded case and furthers the objectives of the law upon which the complaint is based. The Court further determines the proposed Agreed Injunction to be fair, not otherwise unlawful, and not unreasonably restrictive to the rights and interests of third parties. *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993)

Accordingly, the Court hereby **GRANTS** the Parties' Motion and **ENTERS** this Agreed Injunction:

Except as otherwise provided herein, Bernstein shall abide in full by his obligations to EagleBurgmann in Section 5 of his Confidentiality, Non-Disclosure, Restrictive Covenant IP Ownership Agreement ("Agreement" – attached to the Agreed Injunction as **Exhibit A**), until June 3, 2028 ("Bernstein Restricted Period").

As an exception to those obligations, Bernstein may sell (individually, or on behalf of any entity other than PSIG) to any customer or potential customer anywhere in the United States the following products, services and applications during the Bernstein Restricted Period so long as they are not related to the provision of any Static Sealing Solution or Expansion Joint:

- HRSG (Cleaning, Repair & Services) excluding sealing technologies;

- Silencers;

- Welding-specific companies;

- Turbine Repair and Services;

- Manufacture Rep Companies that do not provide, manufacture, promote, or service any products or services that are competitive to EagleBurgmann; and

- Water Treatment Services.

- Ice Blasting

- ACC Repair and Service; and

- Valve Controls.

2

Bernstein shall provide all notices required in Section 10 of his Agreement through the Bernstein Restricted Period, including notice of his ongoing obligations in the Injunction, though the Bernstein Restricted Period, and he shall provide the notice required to EagleBurgmann in Section 10 during the Bernstein Restricted Period no later than 72 hours in advance of any new employment or material change of job responsibilities at K Machine.

PSIG shall be restricted until December 1, 2026 (the "PSIG Restricted Period"), from soliciting (or following up on inquiries for) business from:

A&B Process Systems; API Group, Inc.; FP&L (FP&L is now NexEra and the full restriction will also therefore apply to NexEra); Hoosier; Energy; IHI Power Services Corporation; McCormick Equipment Company; McCormick Power; Wabash Valley Power Alliance; Conemaugh Generating Station; Cordova Energy Center; Crete Energy Center; Cust-O-Fab; Day & Zimmerman; Decatur Energy Center - IL location; El wood Energy center; Exelon Eddystone; Fincantieri Bay Shipbuilding; FLSmidth; Fluid Kinetics; FW Webb; Grand River Energy Center; IPL Georgetown Energy center; IPL Harding Street; Kiewit Power; Lower Mount Bethel; LSP Cottage; Mankato Energy Center; Marathon Catlettsburg; Marathon Joliet; Mid-American Energy Center; Monroe Energy; Morris Cogen-eration; NIPSCO Sugar Creek; P66 Bayway Refinery; PBF Refinery; REC Sili-con; Ryegate; Springdale Energy Center; Vermillion Power; Vogt Power; BP Whiting

Refinery; Lightstone Waterford; DTE East China Cogan/ DTE Blue Water; Indeck Niles; Xcel Energy High Bridge; Xcel Energy Riverside; Xcel In-ver Hills; Invenergy Greys Harborl; AEP Dresden – United A&B; CPV Fairview Energy Center; CPV Three Rivers; CPV Woodbridge Energy Center - UA & UB; Alliant Energy Marshalltown; NAES Astoria Energy; NAES Hobbs Station; NAES Hickory Run; NAES Birdsboro Power Plant; NAES Corporation -Newark Energy Center; NAES AMP Fremont Energy Center; OG&E Red Bud; WE Port Washington; Ethos Cricket Valley Energy; Ethos - Pittsfield Generating Station; LADWP Valley; LADWP Haynes; LADWP Scattergood; Duke Noblesville, Lightstone Lawrenceburg, PG&E Carty Station, CPS Energy, Vistra Odessa, Calpine Guadalupe, NAES Millenium Power, Ethos Middletown Energy Center, AEP Green Country, and Dominion Brunswick. Regarding Entergy facilities outside of Entergy El Dorado, PSIG will not service this specific plant for expansion joint Products only (not including structural upgrades, liner projects, etc.). PSIG will be permitted to service any other Entergy facility for any purpose.

Bernstein shall return and be enjoined from using any Confidential Information (as defined in the Agreement) and/or Trade Secrets (as defined in Texas and Federal Law) that he may have received from EagleBurgmann, including without limitation:

- Any information Bernstein retained regarding EagleBurgmann's product designs and pricing;

- Any information Bernstein retained regarding EagleBurgmann's customers; and

- Any information Bernstein retained regarding EagleBurgmann's business strategies.

PSIG shall return and/or confirm deletion of, and be enjoined from using, Confidential Information (as defined in the Agreement) and/or Trade Secrets (as defined in Texas and Federal Law) it may have received from Bernstein, including without limitation:

- Any information Bernstein provided PSIG regarding EagleBurgmann's product designs and pricing;

- Any information Bernstein provided PSIG regarding EagleBurgmann's customers; and

- Any information Bernstein provided PSIG regarding EagleBurgmann's business strategies.[1]

During each Defendant's respective Restricted Period, Defendants shall each submit quarterly certifications of compliance with this Injunction, with PSIG's two certifications due September 30, 2026, and December 1, 2026, and Bernstein's due at the end of each September, December, March, and June during the Bernstein Restricted Period, and a final certification due on the last day of the Bernstein Restricted Period.

---

[1] By agreeing to this Injunction, Bernstein and PSIG do not admit that any such information that Bernstein allegedly retained or provided to PSIG constitutes Confidential Information and/or Trade Secrets.

During the Bernstein Restricted Period, regarding Bernstein's personal communications with any EagleBurgmann customer representatives with whom he claims a personal relationship,[2] Bernstein:

- Shall not initiate any such communications.

- Is allowed to accept phone calls from and engage in conversations with these individuals, but he must start each interaction with the disclaimer that: "I cannot discuss anything related to PSIG, EagleBurgmann, or the static sealing industry";

- Shall include in his quarterly certificates of compliance that he has abided by these guardrails and list any deviations; and

- for September 1, 2026, and December 31, 2026 quarterly certificates of compliance only, shall submit any written and describe any oral communications with these individuals as part of his certificates of compliance.

The Parties understand and agree that the issues of costs, fees, and damages are expressly reserved from this Agreed Injunction. Nothing in this Agreed Injunction modifies or supersedes any other legal rights of the parties except as expressly modified herein.

---

[2] These include, without limitation, Eric Ratliff, Rick Marshall, Ron Chasse, Michael Armstrong, John Szucs, Chris Rodgers, Marc Hain, Ciector Whitelock, Austin Curtis, Jesse Rodgers, Gerry Kissel, Dane Anderson, Dennis Hamel, Eric Wolfe, Young Park, Clarence "Buddy" Todd, Todd Rapavi, Jeff Rose, and Robert Charles Thomas.

So ORDERED this __18th__ day of June, 2026.

                                                   Honorable Yvonne Y. Ho
                                                   United States Magistrate Judge

# EXHI IT A



**CONFIDENTIALITY, NON-DISCLOSURE, RESTRICTIVE COVENANT, AND IP
OWNERSHIP AGREEMENT**

This Confidentiality, Non-Disclosure, Restrictive Covenant, and IP Ownership Agreement ("Agreement")
is made as of the __ day of February, 2023, by and between Michael Bernstein (the "Employee") and
EagleBurgmann Industries LP ("Employer"), its parents, affiliates, subsidiaries, and joint ventures
(collectively referred to as the "Company").

In consideration of the Company's salary increase to Employee, the continued disclosure of
confidential and/or proprietary information to Employee, the continuation of Employee's employment with
the Company, the compensation and other benefits received by the Employee from Company, and other
good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the
Employee hereby agrees as follows:

1.      Definitions.

1.1     Confidential Information.  For purposes of this Agreement, "Confidential Information"
shall mean information not generally known to the public relating to the Company's business that is
received, created, developed, conceived, or otherwise disclosed to, acquired or made by Employee in
connection with Employee's employment with Company, regardless of whether it is in tangible or
intangible form (including without limitation methods of doing business, product features, strategy,
business plans, financial  information, prices, know-how, personnel information, customer contacts,
preferences and requirements, Intellectual Property (defined below), or other information owned by the
Company or that is disclosed in confidence to the Company by customers, suppliers, and other third parties,
and other confidential documents, materials and information).

1.2     Intellectual Property.  For purposes of this Agreement, "Intellectual Property" shall mean
any of the following relating to the Company's business that are received, created, developed, conceived,
or otherwise acquired or made by Employee in connection with Employee's employment with Company:
(i) designs, technology, techniques, processes, ideas, concepts, discoveries, algorithms, models,
improvements, modifications, know-how, methods, developments, proprietary information, software,
reports, data, work product, works of authorship, and inventions (whether or not patentable); and (ii)
patents, copyrights, trademarks, service marks, trade secrets, trade dress, or other intellectual property rights
associated with the foregoing.

1.3     Proprietary Materials.  For purposes of this Agreement, "Proprietary Materials" shall mean
documents, materials, records, media and other tangible property (confidential or non-confidential) relating
to the Company's business that are received, created, developed, conceived, or otherwise acquired or made
by Employee in connection with Employee's employment with Company.

2.      Non-Disclosure and Ownership.

2.1     Non-Disclosure.  Employee hereby agrees that Employee shall not, during the term of
Employee's employment or any time thereafter, directly or indirectly, disclose, communicate or make
available any Confidential Information to any person or entity for any purpose whatsoever, except as

necessary to perform the functions of Employee's job or as authorized in writing by Company. Notwithstanding the prior sentence, Employee may disclose Confidential Information to the extent such disclosure is required by subpoena or court order, provided, however, that the Employee shall give Company written notice of any request for such information at least ten (10) days (or, if less, as many days as are available) prior to the required disclosure of such information, and the Employee agrees to cooperate with Company to the extent requested to challenge the request or limit the scope thereof.  This obligation does not diminish Employee's independent obligation not to improperly use or disclose the Company's trade secrets.

2.2    Non-Use.  Employee hereby agrees that Employee shall not, during the term of Employee's employment or any time thereafter so long as the information remains confidential, directly or indirectly, use any Confidential Information, Proprietary Materials, or Intellectual Property for any purpose other than to the extent necessary for the purpose of performing services for Company. This obligation does not diminish Employee's independent obligation not to improperly use or disclose the Company's trade secrets.

2.3    Ownership.  Employee agrees that all Intellectual Property and Proprietary Materials created, developed or conceived by Employee in connection with Employee's employment with Company shall be deemed "work for hire."  Without limiting the prior sentence, Employee hereby assigns to the Company all of Employee's right, title, and interest in any Intellectual Property and Proprietary Materials. Employee agrees to execute, acknowledge and deliver any and all documents and instruments necessary or useful to confirm complete ownership thereof by the Company.  Employee waives any and all moral rights Employee may have to the Intellectual Property in the United States and other countries (including without limitation any rights Employee may have under 17 U.S.C. § 106A).  At the request and expense of Company, Employee shall promptly cooperate and render whatever assistance may be requested for Company to apply for, obtain, secure and enforce a patent, copyright, trademark, or other protection (in any and all countries) for the Intellectual Property.  In the event Company is unable, after reasonable effort, to secure Employee's signature on any document(s) reasonably necessary to apply for, obtain, secure or enforce any patent, copyright, trademark, or other protection for the Intellectual Property (whether because of Employee's physical or mental incapacity, incompetence or for any other reason whatsoever), Employee hereby irrevocably makes, constitutes, designates and appoints Company and its duly authorized officers, agents and representatives as Employee's true and lawful agent and attorney-in-fact to act for and in Employee's behalf and stead with the power to execute and file such application(s) and to do all other lawfully permitted acts to secure and otherwise further the issuance and prosecution of any patent, copyright, trademark, or other protection for the Intellectual Property, with the same legal force and effect as if executed by Employee.  Notwithstanding the foregoing provisions of this Section 2.3, Employee is not obligated to assign Employee's rights in an invention that Employee can prove was developed entirely on Employee's own time without using Company's equipment, supplies, facility or trade secret information except for those inventions that (i) relate to Company's business or actual or demonstrably anticipated research or development, or (ii) result from any work performed by Employee for Company.

2.4    Delivery; Return.  Upon the request of Company at any time or upon the termination of Employee's employment with Company for any reason, Employee shall promptly (but in no event more than ten (10) days after written request by Company) return or provide to Company all Confidential Information, Proprietary Materials, and Intellectual Property in any and all tangible forms (and all copies or notes thereof). To the extent the information is stored electronically, upon termination, unless otherwise instructed by the Company, Employee shall permanently delete all such information from personal

2

computers, personal email accounts, personal storage devices, or other personal equipment, but Employee shall not delete any information on equipment possessed by the Company.

3.        Corporate Opportunities.  During Employee's employment, Employee shall promptly and fully disclose to Company any business opportunities involving any existing or prospective line of business or activity of Company, and Employee shall not divert to Employee's own use or benefit, or the use or benefit of others, such opportunities without the prior written approval of the Company.  Employee agrees that Employee shall not accept from any third party, directly or indirectly, benefits, advantages, or remuneration (cash or otherwise) related to or arising out of Company's business, without the prior written consent of the Company.

4.        Immunity Under the Defend Trade Secrets Act.  Employee is hereby notified in accordance with the Defend Trade Secrets Act of 2016 that:

        (a)        Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (b) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding; and

        (b)        If Employee files a lawsuit alleging retaliation by Company for reporting a suspected violation of law, Employee may disclose Company's trade secrets to his or her attorney and use the trade secret information in the court proceeding so long as Employee: (i) files any document containing trade secret information under seal; and (ii) does not disclose the trade secret, except pursuant to a court order.

5.        Restrictive Covenants.  Employee acknowledges that he or she is employed in the highly technical and competitive field of industrial sealing technology ("Business"), which is global in scope.  Employee also acknowledges that during his or her employment with Company, Employee will be provided with, develop, and/or be privy to highly Confidential Information as that term is defined herein, including but not limited to Company trade secrets.  Accordingly, without the prior written consent of Company, while employed at Company and for one year following the cessation of his or her employment, Employee will not directly or indirectly, whether as an owner, partner, officer, director, employee, agent, contractor, consultant, or otherwise:

5.1  Render services or assistance to any person or organization with respect to the financing, research, engineering, development, formulation, production, marketing or selling of a product, service, or process which is the same as, similar to, or competes with, a product or process that Employee had any direct or indirect involvement with or about which Employee acquired or was exposed to Confidential Information or trade secrets at any time during his or her employment with Company;

5.2  Render services or assistance to any person or organization that is engaged in or about to become engaged in the Business or that competes with or intends to compete with the current or planned (if such plans are made known to Employee) business of Employer in the United States of America, or any country in which Employer does business or has customers (such person or organization, a "Competitor"), in a managerial position, a position involving any of the same or similar responsibilities that Employee performed at Company, or any capacity in which Employee could use Confidential Information or trade secrets;

3

5.3 Solicit or service, on behalf of a Competitor: (1) existing customers of Employer who were served or solicited by Employee or by someone under Employee's supervision or about whom Employee acquired Confidential Information at any time during his or her employment with Company, and/or (2) potential customers of Employer that either Employee solicited or an employee under his or her supervision solicited at Employee's direction during the last 12 months of employment with Company;

5.4 Solicit or service, on behalf of any person or organization that is a ==supplier to the power industry, gas turbine market==: (1) existing customers of Employer who were served or solicited by Employee or by someone under Employee's supervision or about whom Employee acquired Confidential Information at any time during his or her employment with Company, and/or (2) potential customers of Employer that either Employee solicited or an employee under his or her supervision solicited at Employee's direction during the last 12 months of employment with Company; and/or

5.5 Attempt to influence any customer or vendor of Employer to terminate its relationship with Employer, to divert, curtail or cancel its orders, contracts or business with Employer, or to conduct with any person or organization other than Employer any activity which such customer conducts or could conduct with Employer with any person or organization other than the Company.

Nothing in this Agreement shall prohibit Employee from owning up to five percent (5%) of the securities of any corporation or other entity that is listed on a national securities exchange or traded in the national over-the-counter market. Employee represents that his or her knowledge, skill and abilities at the time of execution of this Agreement are sufficient to enable Employee, in the event of termination of his or her employment with Company, to earn a satisfactory livelihood without violating the provisions of this Agreement.  The running of the above periods of restriction shall be tolled during any period of Employee's violation of this Section 5 or period of time required for litigation to enforce the provisions hereof. The restrictions contained in Section 5 of this Agreement shall not apply to Employee if barred by applicable law because of Employee's income level.

6.      Employee Tampering.  While employed, and, for one year after the cessation of Employee's employment with Company, Employee will not directly or indirectly solicit, induce or encourage any Employer employees, with whom Employee had contact while at Company or about whom Employee received any Confidential Information, to seek or accept employment with another person or organization.

7.      Acknowledgment.  Employee has carefully read and considered the provisions of this Agreement and, having done so, expressly agrees and acknowledges that (i) the covenants set forth herein are based upon valuable and sufficient consideration, the receipt of which as of the date of this Agreement is hereby acknowledged, and (ii) such covenants are fair and reasonable in all respects, and are reasonably required and necessary for the protection of the legitimate business and competitive interests of Company.

8.      Enforcement Remedies.  Employee covenants, agrees, and recognizes that because the violation, breach, or threatened breach of any of the provisions in this Agreement would result in immediate and irreparable injury to Company, Company shall be entitled, without limitation of remedy, (i) to obtain a temporary restraining order, an injunction and/or other equitable relief restraining Employee from any violation of this Agreement to the fullest extent allowed by law or equity, without the necessity of posting a bond, and (ii) to receive all such amounts to which Company would be entitled as damages under law or

4

at equity.  Nothing herein shall be construed as prohibiting Company from pursuing any other legal or equitable remedies that may be available to it for any such violation, breach, or threatened breach.

9.      Obligations to Third Parties.  Employee hereby represents that Employee is not subject to any restrictions, agreements, understandings or other obligations (express or implied) which would prohibit or limit Employee's employment services for Company (including, without limitation, any non-competition agreement with a former employer). Employee agrees that, in connection with performing services for Company, Employee shall not use or disclose any trade secret or other confidential information which Employee has a duty to keep confidential or seek to acquire any trade secrets owned by any other person or entity.

10.     Employee Certifications.  Employee agrees to comply with all applicable laws, regulations, rules and orders, and all Company policies.  Employee agrees to notify all future employers of Employee's restrictions and obligations under Sections 2, 3, 5 and 6 of this Agreement and to provide new employers with a copy of it.  Employee further agrees to notify Company, in writing, for a period of twelve (12) months following the termination of his or her employment with Company, of every place of employment and business affiliation of Employee and of Employee's duties and responsibilities.

11.     Employment at Will.  Nothing herein shall obligate Company to continue to retain the Employee in Company's employment or to limit Company's ability to terminate the employment of the Employee at will.  Employee understands that his or her employment may be terminated voluntarily or involuntarily by Employee or Company, at any time.  This Agreement does not place any obligation upon Company to employ Employee for any definite period, nor upon Employee to accept employment for any definite period.

12.     Claims: The parties also agree that any legal action relating to Employee's employment other than for a violation of Employee's confidentiality, intellectual property, non-solicitation, and non-compete obligations, must be filed within one year after the date of the decision, event, or employment action that is the subject of the claim.  If a claim is not filed timely, the claim will be deemed to have been waived and forever released.  The parties understand that the statute of limitations for claims arising out of an employment action, including but not limited to discrimination or civil rights claims, may be longer than one year under state or federal law, but acknowledge that they are bound by the one year period of limitations set forth in this Agreement and waive any statute of limitations to the contrary, to the fullest extent permitted by law.

13.     Scope.  If the scope of any restriction contained in this Agreement, including without limitation the duration, geographical scope, activity, or subject associated therewith, is determined by a court of competent jurisdiction to be too broad to permit enforcement thereof to its fullest extent, then such restriction shall be enforced to the maximum extent permitted by law, and the parties hereby consent and agree that such scope may be modified judicially in any proceeding brought to enforce such a restriction.

14.     Severability/Survival.  If any part or provision of this Agreement shall be invalid, illegal, or unenforceable for any reason, the remaining provisions hereof shall remain effective and fully enforceable to the maximum extent permitted by law.  The provisions of Sections 2, 4, 5, 6, 8, 10 and 12 through 16, inclusive, shall survive the end of Employee's employment by Company for any reason.

5

15.     Choice of Law and Forum Selection.  This Agreement, and any dispute or controversy arising out of or relating to this Agreement, shall in all respects be governed by and construed according to the laws of the State of  Texas, excepting its conflict of law provisions.  Employee and the Company agree that the courts of the State of Texas or the United States District Court for the Southern District of Texas  shall have exclusive jurisdiction over any such dispute or controversy and hereby waive, to the fullest extent permitted by the law, the defense of inconvenient forum to the maintenance of such action or proceeding. Employee consents to the personal jurisdiction in the courts of the State of Texas and the United States District Courts located in the Southern District of Texas for purposes of any such dispute or controversy.

16.     Benefit; Amendment; Waiver; Captions; Entire Agreement.  This Agreement shall be binding against Employee's heirs, executors, or other legal representatives or assigns and inure to the benefit of and be enforceable by Company's successors and assigns.  This Agreement is personal to Employee and cannot be assigned by Employee.  Employee agrees that any change in his or her duties, salary, compensation, title or role, including employment by, or loaning, assigning or transferring to any affiliate, subsidiary or joint venture of Employer, after signing this Agreement, will not require the re-signing of this Agreement, nor shall it affect the validity or scope of this Agreement.  This Agreement may not be altered, modified, or amended, in whole or in part, except in writing signed by Employee and Company.  Waiver by Company of any breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.  The captions or headings in this Agreement are for convenience only and in no way define, limit or describe the scope or intent of any provisions or sections of this Agreement.  This Agreement reflects the complete understanding of the parties regarding the subject matter hereof and constitutes their entire agreement, superseding all prior negotiations, representations, agreements, understandings, and statements regarding the subject matter hereof.

17.     Model Release. Employee hereby gives the Company, its legal representatives or assigns, and those acting under its permission and upon its authority, and those for whom the Company is acting, the absolute right and permission to copyright and/or use, and/or publish, exhibit, display or print and publish, in advertising or for other lawful purposes, videos, photographs, photograph negatives, prints of every kind and nature, and all illustrations, pictures, videos, designs, paintings and displays of every kind and nature, wherein Employee has appeared or acted as a model, and reproductions thereto in which Employee may be included in all or in part, in any media and without inspection or approval of the finished product or the use to which it may be applied, provided such product or use relates to the business or projects of the Company or its customers or suppliers. Employee further releases the Company, its assigns, agents or licensees from any liability for what Employee might deem misrepresentation of Employee by virtue of illustrations, optical illusions, or faulty negative reproduction.

18.     Notice and Attorney Consultation. Employee understands and acknowledges that he or she has been given at least fourteen (14) days to review the terms of this Agreement, including the restrictions contained herein, although Employee may choose to sign this Agreement before those fourteen (14) days have expired. Employee acknowledges and agrees that Employee has been encouraged to consult with an attorney about the restrictions before entering into this Agreement.

6

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

"Employee"

"Company"
EagleBurgmann Industries LP

By: _____
         Michael Bernstein

By: _____
         Michael Green
         Click or tap here to enter text.

7